Gene M. GRESSLEY, Plaintiff,

v.

Helen DEUTSCH, Terry P. Roark, and
The Trustees of the University of Wyoming: Bryan Sharratt, W. Perry Dray,
Dan Kinnaman, Forrest Kepler, Harry
Lee Harris, Peter M. Jorgensen, Geraldine Kirk, Jerry Saunders, M.D., Dave
Bonner, Deborah Healy Hammons,
David W. "Bud" Updike, and F. Richard
Brown, Individually, and in their Official Capacities, Defendants.

No. 93–CV–213–D.

United States District Court,
D. Wyoming.

Oct. 5, 1994.

Harold F. Buck, Buck Law Offices, Walter Urbigkit, Cheyenne, WY, for plaintiff, Gene M. Gressley.

Kermit C. Brown, Brown, Erickson & Hiser, Rawlins, WY, for defendant, Helen Deutsch.

Patrick E. Hacker, Cheyenne, WY, for defendant, Terry P. Roark, individually and as President of the University of Wyoming, in his official capacity.

Ford T. Bussart, Bussart, West, Rossetti, Pisia & Tyler, P.C., Rock Springs, WY, for Trustees of the University of Wyoming.

## ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS

DOWNES, District Judge.

The above-entitled matter comes before the Court on several motions: Defendant, Helen Deutsch's Motion to Dismiss Plaintiff's Amended Complaint; Defendant, University of Wyoming Board of Trustees' Motion to Dismiss Plaintiff's Amended Complaint; and Defendant, Terry P. Roark's Motion to Dismiss Plaintiff's Amended Complaint.[1] The Court, having carefully reviewed Defendants' various motions and memorandum in support thereof,[2] Plaintiff's response to these motions, having heard oral argument on the same and being fully advised in the premises, FINDS and ORDERS as follows:

### BACKGROUND

Plaintiff, Dr. Gene Gressley ("Dr. Gressley") was initially employed by the University of Wyoming in 1956 as an Archivist and instructor at the University Library.[3] In 1959 Dr. Gressley was promoted to the position of Assistant Professor. In 1960 he was granted tenure by the University in the library. As a result of his tenure, Dr. Gressley could only be dismissed for cause in accordance with the applicable University of Wyoming regulations. *See* University Regulation 801(2)(b) and Regulation of Trustees, Part V, § 7, attached to Plaintiff's original Complaint, Exhibit No.'s 3 and 4. Dr. Gressley was promoted to Associate Professor in 1962 and to Assistant Director of the library, Director of the Division of Rare Books and Special Collections, Research Professor of American Studies, and Professor in the University Library in 1963. In 1969, Dr. Gressley was also appointed Director of American Studies. At some point, after 1969, Dr. Gressley was made Assistant to the President for the American Heritage Center. One of Dr. Gressley's responsibilities was to collect archival material for the American Heritage Center. Over the years Dr. Gressley was able to acquire significant amounts of archival material from various donors. During this time Dr. Gressley also developed personal ties with some of these donors.

In 1987, the Trustees of the University of Wyoming hired Defendant, Dr. Terry P. Roark, to serve as President of the University. In December of 1987 President Roark reassigned Dr. Gressley from his position as Professor in the University Library and Director of the American Heritage Center to the position of University Professor and Assistant to the President for the American Heritage Center Development. As a University Professor Dr. Gressley was responsible

---

1. A copy of the University of Wyoming's general insurance policy was attached to and incorporated in Roark's Memorandum in Support of his Motion to Dismiss Plaintiff's Amended Complaint. As a consequence, this Court notified all counsel that Roark's Motion to Dismiss would be converted to a Rule 56(b), Fed.R.Civ.P. Motion for Summary Judgment. This notice was made on July 28, 1994, and gave all parties until August 8, 1994 to submit any additional materials. None was submitted. However, for reasons set forth herein the Court does not need to consider the insurance policy or any other materials outside the record to render its decision. Therefore, all motions will be treated as motions to dismiss.

2. After all Defendants had filed Motions to Dismiss Plaintiff's Complaint and before the Court could rule on those Motions, Plaintiff amended his Complaint pursuant to Rule 15(a), Fed. R.Civ.P. In response to Plaintiff's Amended Complaint all Defendants filed similar Motions to Dismiss the Amended Complaint. In his Amended Complaint, Plaintiff has removed all claims against David Baker.

3. The factual background is drawn from Plaintiff's Memorandum in Opposition to Defendants' various Motions and Plaintiff's Complaint and Amended Complaint, along with the attachments thereto.

for teaching, research, and service activities. Administratively, he was to assist in raising funds for the building and operation of the American Heritage Center. In place of Dr. Gressley, Lewis Dabney was appointed Acting Director of the American Heritage Center. Mr. Dabney was subsequently replaced by David Baker, who also served as general counsel for the University of Wyoming.

In February of 1988, Dr. Gressley's office was relocated to the University of Wyoming's Foundation House where he was to assist in raising funds for the building and operation of the American Heritage Center. Despite his removal as Director of the American Heritage Center, donors continued to contact Dr. Gressley, allegedly concerning the mishandling of gifts by his successors at the American Heritage Center. Dr. Gressley contends that he forwarded this correspondence to his successors, but asserts that these donors were not placated. Dr. Gressley grew exasperated with the handling of American Heritage Center affairs and his comments and criticisms to donors and the public became more direct. (*See* Plaintiff's Amended Complaint ¶ 31.)

In August of 1991, Dr. Gressley, responding to a July 30, 1991 letter from President Roark, suggested that he be allowed to send a form letter "to my friends, who are also friends and donors to the University and Center (American Heritage Center)." (Plaintiff's original Complaint, Exhibit No. 6.) In his proposed form letter to his friends and University donors, Dr. Gressley states:

> You may find it as interesting, as I do, that my value to the University is no longer perceived as making friends for the University and acquiring funds and material for the University, but rather in teaching a freshman survey and doing research for which I am restricted in my financial underwriting.

*Id.* By letter dated August 29, 1991, President Roark responded to Dr. Gressley, "To the extent you are seeking my approval of your letter you certainly do not have it. I do not think the letter is in the best interest of the University, nor even your own best interest." *Id.* President Roark further stated that "[t]he reason I provided instruction to you regarding the manner in which to communicate to donors and patrons of the University was my concern about your apparent inability to communicate accurately and in the best interests of the University." *Id.*

In June of 1990, Dr. Gressley's assignment as Assistant to the President for the American Heritage Center Development was concluded by President Roark. Dr. Gressley asserts that this action was an attempt to preclude him from having any direct involvement with the American Heritage Center as retaliation for his criticism of the successor Directors of the American Heritage Center. In the fall of 1991 Dr. Gressley's office was relocated to the basement of the Extended Studies building. Apparently, Dr. Gressley requested that he be allowed to furnish his office with some materials on loan from the University of Wyoming's American Heritage Center "to make the appearance of his new office seem fitting for a University Professor." (Plaintiff's Amended Complaint ¶ 36.) President Roark refused to allow Gressley to move University property from his former office to his new office. Based upon representations made by David Baker [4] concerning ownership and "in order to maintain a modicum of dignity," Dr. Gressley contacted University donors so their property could be "utilized to provide some class and convenience for his [Gressley's] reassigned basement office." *Id.*

One of the University donors that Dr. Gressley contacted was Ms. Helen Deutsch. Ms. Deutsch's late husband was a film composer whose works (artifacts) had apparently been secured for the University by Dr. Gressley. Dr. Gressley asserts that Ms. Deutsch told him he could move her late husband's artifacts (in particular a "Duffy" painting) to his new office and, allegedly, "asked him [Dr. Gressley] to write a letter for her signature and back date it granting

---

**4.** Mr. Baker is the University of Wyoming's general counsel and, in the fall of 1988, served as interim director of the American Heritage Center. Plaintiff alleges that Mr. Baker represented that the University of Wyoming did not own materials given to the University by donors for which their was no deed of gift.

permission." *Id.* ¶ 37. Dr. Gressley wrote such a letter. *See Id.; see also,* Exhibit 4 as attached to Plaintiff's Original Complaint. According to Dr. Gressley, Ms. Deutsch subsequently became upset with him when one of the artifacts her late husband had given to the University (a set of cufflinks) was not returned at her request. As a consequence, Ms. Deutsch delivered the letters from Dr. Gressley[5] to President Roark and Mr. Baker. (Plaintiff's Amended Complaint ¶ 38.) Subsequent to the receipt of these letters, proceedings were initiated by President Roark to terminate Dr. Gressley from his position as a tenured University Professor. *Id.* ¶¶ 40–41; *see also,* Exhibit No. 1 to Plaintiff's original Complaint.

In April of 1992, President Roark submitted informal charges against Dr. Gressley in which he recommended that Dr. Gressley be dismissed as an employee of the University of Wyoming. *See* Exhibit No. 1, as attached to Plaintiff's original Complaint. President Roark's informal charges set forth three (3) reasons, along with specific facts in support thereof, why he sought the dismissal of Dr. Gressley: (1) solicitation of contribution and receiving communications which were not forwarded to the appropriate persons and communication with donors in violation of instructions and job descriptions; (2) uncooperative in responding to directives and being insubordinate to the express instructions of the President of the University of Wyoming; and (3) negligent or deliberately inaccurate accounting for University property and failing to return valuable property to the American Heritage Center. (*See* Plaintiff's original Complaint, Exhibit No. 1.)

After an apparent attempt to settle the differences between President Roark and Dr. Gressley proved unavailing, counsel for Dr. Gressley requested that President Roark's charges be filed.[6] Under the University of Wyoming's regulations, University Regula-

tion 801(3)(a)(3) (hereinafter "UniReg."), "[i]f at any time during the preliminary proceedings the faculty member requests that the formal proceedings be held, these shall be initiated within one month or the matter shall be dropped." (Plaintiff's original Complaint, Exhibit No. 3.) Plaintiff's Amended Complaint indicates that formal charges were not brought or filed against Dr. Gressley until November 10, 1992. (*See* Plaintiff's Amended Complaint, ¶ 42; *see also,* Plaintiff's original Complaint, Exhibit No. 4.) After the formal charges were filed pursuant to UniReg. 801(3)(b), and after voir dire by counsel, a Faculty Hearing Committee was formed to hear the formal charges. After a two week hearing in January and early February of 1992, the Faculty Hearing Committee found that portions of the formal charges were not brought in a timely manner as required under UniReg. 801(3)(a)(3), but sustained three charges: (1) interfering with the administration of the American Heritage Center regarding donor matters; (2) failing to account for University property; and (3) making misstatements in relationship to the Helen Deutsch matter. Based upon these findings, the Faculty Hearing Committee sustained President Roark's charges and recommended that Dr. Gressley be dismissed for cause. (*See* Memorandum of Trustees in Support of Motion to Dismiss at 2; *see also,* Plaintiff's Amended Complaint ¶¶ 42–44; and Plaintiff's original Complaint, Exhibit No. 8.)

In accordance with University Regulation 801(3)(e)(2) the Faculty Hearing Committee's recommendation was appealed to the University of Wyoming Board of Trustees. (*See* Plaintiff's Amended Complaint ¶ 51.) In May of 1993, after hearing oral arguments, reviewing the record before and findings of the Faculty Hearing Committee, the Board of Trustees, with some exceptions, sustained the Faculty Hearing Committee's recommendation that Dr. Gressley's employment with the University of Wyoming be terminated for

---

5. Dr. Gressley's August 9, 1991 letter and Mrs. Deutsch's April 22, 1991 letter is attached as Exhibit No. 4 to Plaintiff's original Complaint.

6. By letter dated August 11, 1992, to President Roark's counsel, Plaintiff's counsel stated "I must ask you again to file the charges as this seems the only way Gene (Plaintiff) may have to

cause [7]. (*See* Plaintiff's Amended Complaint ¶ 52; *see also*, Exhibit No. 8, as attached to Plaintiff's Original Complaint.) The Board further approved President Roark's recommendation about the conditions of dismissal. (*See* Exhibit No. 8.)

On July 23, 1993, Dr. Gressley filed this action. After all Defendants filed motions to dismiss, Plaintiff amended his original complaint. In his amended complaint, Dr. Gressley sets forth six claims for relief: (1) breach of contract against the Trustees of the University of Wyoming; (2) a claim against all defendants pursuant to 42 U.S.C. § 1983 for violation of due process; (3) a claim against President Roark and the Trustees, pursuant to 42 U.S.C. § 1983, for violation of his first amendment rights to freedom of speech and association; (4) a defamation claim against Mrs. Deutsch and President Roark; (5) a claim for injunctive and declaratory relief against President Roark and the Trustees; and (6) a claim for punitive damages against President Roark and Mrs. Deutsch.

In response to Dr. Gressley's Complaint, and his Amended Complaint, all Defendants filed motions to dismiss. Mrs. Deutsch's Motion to Dismiss asserts four separate grounds for dismissal: (1) failure to make any showing of state action; (2) failure to properly plead as to proximate cause; (3) absolute immunity; and (4) failure to state a claim for defamation.

The University of Wyoming Board of Trustees ("Board of Trustees") seeks dismissal on seven separate grounds: (1) Plaintiff's claim for breach of contract is barred by Plaintiff's failure to exhaust his remedies; (2) Plaintiff is collaterally estopped from bringing a claim for breach of contract; (3) Plaintiff's 42 U.S.C. § 1983 claims, second and third claims, are barred by the Eleventh

Amendment to the United States Constitution; (4) Plaintiff's 42 U.S.C. § 1983 claims fail to state cognizable claims thereunder; (5) Plaintiff's fifth claim for injunctive and declaratory relief fails to state a cognizable claim under 28 U.S.C. §§ 2201 and 2202 or Rule 65, Fed.R.Civ.P.; (6) the Board of Trustees is cloaked with absolute judicial immunity; and (7) the Board of Trustees is entitled to the privilege of good faith immunity.

President Roark argues seven grounds in support of his dismissal of Plaintiff's Amended Complaint: (1) President Roark, in his official capacity, is not a person for purposes of 42 U.S.C. § 1983; (2) President Roark, in his individual capacity, is entitled to qualified immunity; (3) Plaintiff's actions are barred by the Eleventh Amendment to the United States Constitution; (4) portions of Plaintiff's action are barred by the applicable statute of limitations; (5) the decision of the Faculty Hearing Committee demonstrates that the Plaintiff would have been terminated notwithstanding any exercise of constitutionally protected rights; (6) Plaintiff is collaterally estopped from bringing an action for defamation; and (7) Plaintiff's state law claims are barred by the Wyoming Governmental Claims Act.

## STANDARD OF REVIEW

The standard of review applied to a motion to dismiss for failure to state a claim is well-established. This Court must accept as true the Plaintiff's well-pleaded factual allegations and draw all reasonable inferences in Plaintiff's favor. *See, Zilkha Energy Co. v. Leighton*, 920 F.2d 1520, 1523 (10th Cir.1990). Dismissal for failure to state a claim is appropriate only if the Plaintiff can

---

clear his name." *See* Plaintiff's original Complaint, Exhibit No. 2.

7. The Board of Trustees sustained the Faculty Senate Ad Hoc Hearing Committee's recommendation of dismissal for cause. However, it rejected: (1) the committee's conclusion that insubordination to the president alone is not itself cause for dismissal; (2) that portions of the Formal Charges were not brought in a timely manner; and (3) the Hearing Committee's consideration of the testimony of Mrs. Deutsch because Dr. Gressley's counsel did not have an opportunity to

cross-examine her; nevertheless, in absence of Mrs. Deutsch's testimony, the Board of Trustees concluded that clear and convincing evidence existed in the record to sustain the Hearing Committee's other findings. In rejecting the Faculty Hearing Committee's finding that the Formal Charges were not timely brought, the Board of Trustees concluded that Dr. Gressley's counsel had waived the proceedings set forth under Uni-Reg. 801(3)(1)(a). *See* Plaintiff's original Complaint, Exhibit No. 8 at 4–5.

prove no set of facts that would entitle him to relief. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Daigle v. Shell Oil Co.,* 972 F.2d 1527, 1533 (10th Cir.1992); *see also Hospice of Metro Denver v. Group Health Ins. of Oklahoma, Inc.,* 944 F.2d 752, 753 (10th Cir. 1991) (per curiam) (citing *Morgan v. City of Rawlins,* 792 F.2d 975, 978 (10th Cir.1986).

The Tenth Circuit Court has stated that, at this stage, this Court's "function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Miller v. Glanz,* 948 F.2d 1562, 1565 (10th Cir. 1991). With these standards and limitations in mind, this Court will turn to the issues raised by Defendants' Motions to Dismiss.

### PLAINTIFF'S 42 U.S.C. § 1983 CLAIMS

Under 42 U.S.C. § 1983:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.... *Id.*

Plaintiff's second claim for relief, grounded upon 42 U.S.C. § 1983, alleges that Defendants Roark and the Board of Trustees deprived, under the color of state law, Plaintiff's property interest in his continued employment without due process of law. (*See* Plaintiff's Amended Complaint ¶ 58.) Plaintiff further alleges that Defendant Deutsch "acted in concert and conspired with the other Defendants to falsely deprive Plaintiff of his liberty interest in his good name and reputation proximately causing Plaintiff damage." *Id.* ¶ 59. Finally, Plaintiff asserts that Defendants' acts violated clearly established law which a reasonable person should have known. Plaintiff's third claim of relief, also based upon section 1983, alleges that Defendants Roark and the Board of Trustees, un-

der color of state law, retaliated against Dr. Gressley for the content of his speech in speaking on legitimate matters of public concern, including complaints regarding the shabby treatment donors were receiving. (*See* Plaintiff's Amended Complaint ¶ 63.) Plaintiff also alleges that President Roark and the Board of Trustees retaliated against Plaintiff on account of his association with important people around the state and prohibited Plaintiff from contacting these individuals and telling them that his ability to speak to them on certain matters had been curtailed by these Defendants. *Id.*

The United States Supreme Court has held that "[t]o state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 2254–55, 101 L.Ed.2d 40 (1988) (citing *Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 155, 98 S.Ct. 1729, 1732–33, 56 L.Ed.2d 185 (1978)). As set forth under ¶ 9 of Plaintiff's Amended Complaint, he was granted tenure by the Board of Trustees in 1960. Pursuant to Uni-Reg. 801(2)(b) and the Regulations of the Trustees, Chapter V, Section 7, a tenured faculty member may only be dismissed for cause or due to a bona fide financial exigency of the University. (*See* Plaintiff's original Complaint, Exhibits No.'s 3 and 4.) The power to promulgate these regulations is vested in the Board of Trustees pursuant to Wyo.Stat. § 21–17–204(a) (1992). By virtue of these regulations, Plaintiff held a legitimate claim of entitlement to his continued employment (a property interest) that he could not be deprived of absent due process. *See Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Plaintiff also enjoys constitutional rights, freedom of speech and association, under the First Amendment to the United States Constitution, which he asserts were violated. (*See* Plaintiff's Amended Complaint, ¶ 63.)

The next element that Plaintiff must show is that he was deprived of these rights by a person acting under color of state law. *See West v. Atkins, supra,* 487 U.S. at

48, 108 S.Ct. at 2254–55. To establish state action under a § 1983 claim:

> "the deprivation must be caused by the exercise of some right or privilege created by the State ... or by a person for whom the State is responsible," and "the party charged with the deprivation must be a person who may fairly said to be a state actor." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 [102 S.Ct. 2744, 2754, 73 L.Ed.2d 482] (1982). "[S]tate employment is generally sufficient to render the defendant a state actor." *Id.*, at 936, n. 18 [102 S.Ct. 2753, n. 18]; see *id.*, at 937 [102 S.Ct. at 2753–54].

*West*, 487 U.S. at 49, 108 S.Ct. at 2255. The powers and authority of the President of the University of Wyoming are delineated under Wyo.Stat. §§ 21–17–103, 104 (1992). The powers and authority of the Board of Trustees is set forth under Wyo.Stat. §§ 21–17–203, 204. Under these statutes the Board of Trustees is expressly granted the authority "to prescribe rules for the government of the university and all its branches, elect the requisite officers, professors, instructors and employees ... any of whom may be removed for cause...." Wyo.Stat. § 21–17–204(a) (1992). Under Wyo.Stat. § 21–17–103, the president of the university may enforce rules and regulations adopted by the Board of Trustees. Based upon these Wyoming Statutes it may fairly be said that President Roark and the Board of Trustees are state actors. However, the same cannot be said of Defendant Deutsch.

### a. Plaintiff's Conspiracy Claim against Deutsch

■ In order to establish a § 1983 cause of action, which requires "state action", against Defendant Deutsch who is a private party, Plaintiff must establish that Defendant Deutsch conspired with state officials (President Roark and the Board of Trustees) in depriving Plaintiff of his Constitutional rights. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150, 90 S.Ct. 1598, 1604–05, 26 L.Ed.2d 142 (1970); and *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 931, 102

S.Ct. 2744, 2750, 73 L.Ed.2d 482 (1982). In *Lugar* the Supreme Court, clarifying its holding in *Adickes*, stated:

> we held (in *Adickes*) that the private parties joint participation with a state official in a conspiracy to discriminate would constitute both "state action essential to show a direct violation of plaintiff's Fourteenth Amendment equal protection rights" and action "under color of law for purposes of the statute."

*Lugar, supra.*

■ In deciding whether a conspiracy exists, this Court is mindful that caution is advised in any pre-trial disposition of conspiracy allegations in civil rights actions. *See Fisher v. Shamburg*, 624 F.2d 156, 162 (10th Cir.1980). Nonetheless, it has repeatedly been recognized that in order to avoid dismissal,

> [w]hen a plaintiff in a § 1983 action attempts to assert the necessary "state action" by implicating a state official in a conspiracy with private defendants, *the pleadings must specifically present facts showing agreement and concerted action. Conclusory allegations without supporting facts are insufficient.*

*Hammond v. Bales*, 843 F.2d 1320, 1323 (10th Cir.1988) (citing with approval *Sooner Products Co. v. McBride*, 708 F.2d 510, 512 (10th Cir.1983)) (emphasis added); and see *Clulow v. Oklahoma*, 700 F.2d 1291, 1303 (10th Cir.1983). It has also been held that where a plaintiff fails to allege specific facts showing agreement and concerted action among the defendants, a court may properly dismiss a "conspiracy claim" with prejudice. *Durre v. Dempsey*, 869 F.2d 543 (10th Cir. 1989) (citing with approval, *Sooner Prods. Co. v. McBride, supra.*) The court in *Durre* went on to hold that "[c]onclusory allegations of conspiracy are insufficient to state a valid § 1983 claim." *Durre, supra*, at 545. At a minimum, this case law requires that Plaintiff's Amended Complaint allege specific facts showing agreement and concerted action between Defendants Deutsch and Roark or the Board of Trustees.[8] A review of Plaintiff's

---

**8.** It is important to note that Plaintiff amended his complaint after all Defendants filed their initial Motions to Dismiss which are almost identical to the Motions to Dismiss Plaintiff's Amended

Amended Complaint reveals that he has failed to meet these requirements.[9]

The substance of Plaintiff's Amended Complaint does not present any facts showing any agreement with Defendant Deutsch between either Defendants Roark or the Board of Trustees. While she may have caused the letters (for the removal of the "Duffy") to be delivered to Defendant Roark and Mr. Baker, no facts are alleged that this was pursuant to any agreement with Defendant Roark or the Board of Trustees to get Plaintiff removed and/or deprive him of due process or his liberty interests. Furthermore, it was President Roark who brought the charges seeking Plaintiff's dismissal in which the incident with Defendant Deutsch was but one of several incidents which Dr. Roark relied upon in seeking Plaintiff's dismissal. (*See* Plaintiff's original Complaint, Exhibit No. 4.) It should also be noted that the Board of Trustees disregarded Defendant Deutsch's testimony in affirming the Faculty Hearing Committee's recommendation that Plaintiff should be dismissed. (*See* Plaintiff's original Complaint, Exhibit No. 8, at 8–9.)

Plaintiff's Amended Complaint is devoid of any facts, let alone specific facts, showing agreement and concerted action between Defendant Deutsch, President Roark or the Board of Trustees. Instead, the facts establish that Plaintiff contacted Defendant Deutsch by letter on August 9, 1991. Plaintiff wrote a letter to her concerning a Duffy painting that he wanted to put in his office "in order to maintain a modicum of dignity." (Plaintiff's original Complaint, Exhibit No. 4; Amended Complaint, ¶¶ 36–37.) Sometime after this correspondence, Defendant Deutsch became "disenchanted" with Plaintiff when one of the artifacts given to the University by her late husband was not returned to her after so requesting. *Id.* ¶ 38. At this point Defendant Deutsch delivered Plaintiff's letters to Roark and Baker, allegedly accompanied by a false statement that she did not direct the letters to be written. *Id.* President Roark then used those letters as one of several reasons to support his charges that Plaintiff's employment should be terminated from the University. *Id.* ¶ 39. Even reviewing Plaintiff's Amended Complaint in a light most favorable to him, it is devoid of any facts that would establish Defendant Deutsch conspired with President Roark or the Board of Trustees in an attempt to deprive him of this constitutional rights.

In response to Deutsch's motion to dismiss, Plaintiff replies, "[I]f it need be more explicitly stated, Helen Deutsch's actions were taken with the specific intent to have Dr. Gressley terminated from his employment." (Plaintiff's Memorandum in Opposition to Defendants' Motions at 21.) However, this too is simply a conclusory allegation of a conspiracy which is insufficient to state a valid claim. *See Durre v. Dempsey, supra,* at 545. Due to Plaintiff's failure to plead any specific facts showing agreement and con-

Complaint. Thus, Plaintiff was forewarned of the potential deficiencies in his complaint.

9. Paragraph 37 of Plaintiff's Amended Complaint states:

Gressley contacted Helen Deutsch. Helen is the widow of a Hollywood film composer whose works Dr. Gressley had secured for the University. Helen told Dr. Gressley he could move the items to his new office and then asked him to write a letter for her signature and back date it granting permission. Dr. Gressley complied.

Plaintiff further states at ¶ 38:

Unknown to Dr. Gressley, Deutsch had become disenchanted with him when one of the artifacts which her husband had given to the University (a set of cufflinks) was, upon her request, not returned to her. Apparently blaming Dr. Gressley, Mrs. Deutsch, rather than helping him, caused the letters to be delivered to Roark and Baker, accompanied by the false statement that she did not direct the letters originally to be written."

Plaintiff then asserts at ¶ 39:

Roark and Baker then utilized the letters as a justification for Gressley's termination as a tenured University Professor. . . .

Plaintiff then concludes at ¶ 59:

Helen Deutsch acted in concert and conspired with the other Defendants to falsely deprive Plaintiff of his liberty interest in his good name and reputation proximately causing Plaintiff damage.

Plaintiff then surmises at ¶ 60:

The other Defendants, knowing of Mrs. Deutsch's continued defamation of Plaintiff, have nonetheless agreed to pay for her attorneys so as to encourage her in creating an atmosphere to inhibit Dr. Gressley's re-employment.

certed action between Defendants Deutsch and President Roark or the Board of Trustees, his conspiracy claim must be dismissed. In light of this determination, the other issues raised in Defendant Deutsch's motion to dismiss, with respect to the § 1983 claim, need not be addressed.

### b. The Eleventh Amendment–Official Capacity Liability

 Plaintiff has brought suit against President Roark and the Board of Trustees in their individual as well as official capacities. Judge Brimmer recently summarized the distinction and importance between a party's official capacity and individual capacity:

A plaintiff may sue a defendant in either his individual capacity, his official capacity, or, as is the case here, in both capacities. While the distinction between these two types of suits had not always been readily apparent, *see Brandon v. Holt,* 469 U.S. 464, 471–73, 105 S.Ct. 873, 877–79, 83 L.Ed.2d 878 (1985), the Supreme Court has recently reaffirmed that suits in both capacities are indeed viable. *See e.g., Hafer v. Melo,* 502 U.S. 21, 23–27, 112 S.Ct. [358] at 361–62 [116 L.Ed.2d 301] (1991) (citations omitted).

The capacity in which a defendant is sued is an important fact. In *Kentucky v. Graham,* 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985), the Supreme Court summarized the difference between an individual, or personal-capacity suit and an official-capacity suit. The Court stated that:

[p]ersonal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law ... [o]fficial-capacity suits, in contrast, generally represent only another way of pleading an action against an entity of which an officer is an agent ... an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.

*See id.* at 165–66, 105 S.Ct. at 3105; *see also Brandon,* 469 U.S. at 471–72, 105 S.Ct. at 877–78.

*Gardetto v. Mason,* 854 F.Supp. 1520, 1527 (D.Wyo.1994). Thus, to the extent Plaintiff has sued both Dr. Roark and the Board of Trustees in their official capacities, Plaintiff has sued the University of Wyoming. *See, e.g., Prebble v. Brodrick,* 535 F.2d 605, 610 (10th Cir.1976) (citing *Williams v. Eaton,* 443 F.2d 422, 427–28 (10th Cir.1971)) (suit for damages against the President and Trustees of the University in their official capacities was equivalent to suit against the state of Wyoming); *see also Garcia v. Bd. of Ed. of Socorro Consol. Sch. Dist.,* 777 F.2d 1403, 1407 (10th Cir.1985). Relying on *Prebble* and *Williams,* Defendants assert that Plaintiff's claims against President Roark and the Board of Trustees of the University of Wyoming, in their official capacities, is barred by the Eleventh Amendment to the United States Constitution. The Eleventh Amendment provides:

[t]he Judicial power to the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.[10]

 Thus, this Court must determine whether the University of Wyoming is to be treated as an arm of the State, partaking of the State's Eleventh Amendment immunity, or should be treated more like a county or city to which Eleventh Amendment immunity is unavailable. *See, e.g., Ambus v. Granite Bd. of Educ.,* 975 F.2d 1555, 1560 (10th Cir. 1992), *aff'd and modified,* 995 F.2d 992 (10th Cir.1993). In *Ambus,* the court set out the test, based upon the Supreme Court's decision in *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), to be applied in determining whether school districts are arms or alter egos of the state entitled to Eleventh Amendment immunity:

we have asked two essential questions: '(1) To what extent does the board, although carrying out a state mission, function with substantial autonomy from state government and, (2) to what extent is the agency

---

**10.** The Eleventh Amendment has also been interpreted to bar suits in federal courts by citizens of the defendant state. *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890).

financed independently of the state treasury.'

*Ambus, supra,* at 1561 (citing *Unified School District No. 480 v. Epperson,* 583 F.2d 1118, 1121–22 (10th Cir.1978)). This Court sees no reason why the same analysis should not be applied in this case.

The University of Wyoming is established pursuant to Article 7, § 15 of the Wyoming Constitution. Pursuant to Article 7, § 17:

> [t]he legislature shall provide by law for the management of the university, its lands and other property by a board of trustees, consisting of not less than seven members, to be appointed by the governor by and with the advice and consent of the senate, and the president of the university, and the superintendent of public instruction, as members ex officio, as such having the right to speak, but not to vote. The duties and powers of the trustees shall be prescribed by law.

Under Wyo.Stat. § 21–17–202(a) (1992), the legislature has set forth the appointment process to be used which requires the State Senate to confirm any appointment to the Board of Trustees made by the Governor. In its pertinent parts, Article 1, § 8 provides:

> [s]uits may be brought against the state in such manner and in such courts as the legislature may direct.

Furthermore, under Wyo.Stat. § 1–35–101 (Supp.1994):

> Any action permitted by law which is brought against the ... trustees of the University of Wyoming is an action against the state of Wyoming and no action shall be brought against any such boards, commissions or trustees except in the courts of the state of Wyoming, and no action shall be maintained against any of such boards, commissions or trustees in any other jurisdiction.

Finally, under the Wyoming Governmental Claims Act, Wyo.Stat. §§ 1–39–101 to 1–39–120, suit may be brought against a governmental entity, the definition of which includes the University of Wyoming, for breach of contract and tort claims. Wyo.Stat. § 1–39–103(a)(i) (Cum.Supp.1994). However, jurisdiction for these claims is limited to state district courts. Under Wyo.Stat. § 1–39–117(a), "[o]riginal and exclusive jurisdiction *for any claim under this act* shall be in the district courts of Wyoming...." *Id.* (emphasis added).

The funding mechanisms for the University are set forth under Wyo.Stat. § 21–17–107 (1992), which provides:

> The legislature shall appropriate monies intended for the support and maintenance of the University of Wyoming. The appropriations shall specify the purpose for which the monies are intended and may be used. The appropriations shall apply to and include all monies received by the university from the United States for the endowment and support of colleges for the benefit of agriculture and mechanic arts. No expenditure shall be made in excess of an appropriation, and no monies so appropriated shall be used for any purpose other than that for which they are appropriated.

In addition, the President of the University is required to provide a detailed report to the governor concerning the financial as well as educational status of the University. Wyo.Stat. § 21–17–205 (1992). The secretary and treasurer of the University's Board of Trustees is required to provide a yearly detailed financial report to be filed with the secretary of state accounting for monies appropriated to the University. *Id.* Under the Governmental Claims Act, "governmental entity" is defined to include the state, University of Wyoming or any local government; however, the University of Wyoming is not included within the definition of "local government." *See* Wyo.Stat. § 1–39–103(a) (Supp.1994).

Applying the guidelines set forth in *Ambus v. Granite Bd. of Educ., supra,* as extracted from *Mt. Healthy v. Doyle,* to the facts set forth above, this Court concludes that the University of Wyoming is an alter ego of the State of Wyoming. Pursuant to the Wyoming Constitution and statutes set forth above, any suit against the University is treated as a suit against the state. The University does not function with substantial autonomy from the state government. Furthermore, its funding and spending are strictly controlled through appropriations

made by the state legislature. *See Haldeman v. State of Wyoming Farm Loan Board,* 32 F.3d 469 (10th Cir.1994).

Finally, a review of the holdings in *Prebble v. Brodrick, supra,* and *Williams v. Eaton, supra,* and the underlying reasoning therein, combined with the fact that no significant changes have occurred in Wyoming law altering the legal or funding structure of the University of Wyoming, this Court will not question these holdings. *See Garcia v. Bd. of Ed. of Socorro Consol. Sch. Dist., supra,* at 1407 (Tenth Circuit was bound by prior determinations wherein it was concluded that New Mexico school boards were arms of the state); *but see Ambus v. Granite,* 995 F.2d at 994 (where appellate court reconsidered and reversed its prior extension of Eleventh Amendment immunity in light of decision in *Mt. Healthy, supra.*) This Court is unaware of any changes in Wyoming law and, even applying the post *Mt. Healthy* analysis, the University of Wyoming is still entitled to Eleventh Amendment immunity.

▬▬ In an attempt to avoid the immunity provided by the Eleventh Amendment, Plaintiff has asserted and argued that the University has insurance to cover these claims. Therefore, Plaintiff argues, the principle upon which Eleventh Amendment immunity is grounded, protection of state coffers, will not be violated by Plaintiff's action. This argument is premised on the grounds that a state may waive its immunity under the Eleventh Amendment. However, "[i]n deciding whether a State has waived its constitutional protection under the Eleventh Amendment, we will find waiver only where stated 'by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction.'" *Edelman v. Jordan, supra* (citing *Murray v. Wilson Distilling Co.,* 213 U.S. 151, 171, 29 S.Ct. 458, 464–65, 53 L.Ed. 742 (1909)). Plaintiff cites no authority to support its argument that the presence of insurance removes the immunity afforded by the Eleventh Amendment. To the contrary, several courts have recognized that the presence of insurance does not waive a state's Eleventh Amendment immunity. *See, e.g., Wallace v. State of Okl.,* 721 F.2d 301,

305 (10th Cir.1983) (Oklahoma statute which waived state court defense of sovereign immunity for claim covered by liability insurance did not waive Eleventh Amendment immunity in federal court); *Rogosta, Sr. v. State of Vermont,* 556 F.Supp. 220 (D.Vt. 1981) (insurance policy purchased by the state did not amount to a waiver of immunity under Eleventh Amendment); and *Hobbs v. Georgia Dept. of Transp.,* 785 F.Supp. 980, 984 (N.D.Ga.1991) (mere creation of an insurance fund to protect state treasury does not act as an implicit waiver of a states Eleventh Amendment immunity.) Moreover, the waiver of *sovereign* immunity in certain circumstances does not by itself amount to a waiver of a state's Eleventh Amendment immunity. *See Seibert v. U. of Okl. Health Sciences Center,* 867 F.2d 591, 595 (10th Cir.1989). Based upon this authority, even assuming that the University of Wyoming has insurance to cover the claims now being asserted by Plaintiff, this does not amount to a waiver of the immunity provided by the Eleventh Amendment.

### c. Plaintiff's Claim for Injunctive and Declaratory Relief

▬▬ While the Eleventh Amendment precludes a claim for money damages or retroactive relief against the University of Wyoming and President Roark as well as the Trustees of the University in their official capacities, it does not prevent prospective injunctive relief against these Defendants. *See Edelman v. Jordan,* 415 U.S. 651, 677, 94 S.Ct. 1347, 1362–63, 39 L.Ed.2d 662 (1974); and *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

In *Edelman,* the Supreme Court held that:

[t]hough a § 1983 action may be instituted by public aid recipients such as respondent, a federal court's remedial power, consistent with the Eleventh Amendment, is necessarily limited to prospective injunctive relief, *Ex parte Young, supra,* and *may not include a retroactive award which requires the payment of funds from the state treasury, Ford Motor Co. v. Department of Treasury,* 323 U.S. 459, [65 S.Ct. 347, 89 L.Ed. 389] (1945).

*Edelman, supra,* at 677, 94 S.Ct. at 1362 (emphasis added). The issue in *Edelman* arose out of a decision by the Court of Appeals wherein it concluded that the Eleventh Amendment, applying the Supreme Court's prior holding in *Ex parte Young, supra,* did not bar the award of retroactive payments of certain statutory benefits which were found to have been wrongfully withheld. The Court of Appeals reasoned that the grant of such a monetary award was in the nature of equitable restitution allowed in *Ex parte Young.* The Supreme Court rejected such a broad reading of *Ex parte Young,* and concluded:

> [w]e do not read *Ex Parte Young* or subsequent holdings of this Court to indicate that any form of relief may be awarded against a state officer, no matter how closely it may in practice resemble a money judgment payable out of the state treasury, so long as the relief may be labeled "equitable" in nature.

*Edelman, supra,* at 666, 94 S.Ct. at 1357.

Thus, to the extent that Plaintiff seeks to obtain prospective relief from Defendants Roark and the Board of Trustees, in their official capacities, this Court is not precluded, by the Eleventh Amendment, from exercising jurisdiction over such claims. *See, e.g., Dwyer v. Regan,* 777 F.2d 825, 835–36 (2nd Cir.1985); *see also, Johnson v. Wefald,* 779 F.Supp. 154, 156 (D.Kan.1991). In *Dwyer,* the court, faced with similar claims and issues, concluded that to the extent plaintiff sought reinstatement to his prior position, the Eleventh Amendment did not bar such an action. *Dwyer, supra,* at 836. However, the court concluded that plaintiff's claims for backpay, compensatory and punitive damages were barred by the Eleventh Amendment, absent a waiver by the state. *Id.* This Court agrees with the analysis set forth in *Dwyer* and concludes that Plaintiff's claim for injunctive relief, requesting that Plaintiff be re-instated to his position at the University of Wyoming, is not barred by the Eleventh Amendment and remains viable. (*See* Plaintiff's Amended Complaint, ¶¶ 68–69.) However, as with any other request for injunctive relief, plaintiff must show a substantial likelihood that he will eventually prevail on the merits of his claim. *See SCFC ILC, INC. v. Visa USA, Inc.,* 936 F.2d 1096, 1098 (10th Cir.1991). As revealed by the ensuing analysis, this is not the case.

To clarify, Plaintiff's claims against Defendants Roark and the Board of Trustees for the University of Wyoming, in their official capacities, to the extent it seeks money damages and/or retroactive relief, is precluded as a result of the Eleventh Amendment immunity enjoyed by the University of Wyoming, as an alter ego of the State of Wyoming.

### d. Absolute Immunity

■ Defendants, the individual members of the University of Wyoming Board of Trustees, assert that they are absolutely immune from individual liability for the part they played in Plaintiff's termination. Specifically, these Defendants assert that they "acted exclusively in an appellate capacity, reviewing a record of a de novo hearing at which plaintiff enjoyed the full panoply of his rights; reviewed briefing by Plaintiff's counsel; and heard oral argument by Plaintiff's counsel." (Defendant, Board of Trustees Memorandum in Support of Motion to Dismiss at 15.) Essentially, these Defendants argue that, in accordance with University Regulation 801(3)(e), they acted in a quasi-judicial role in reviewing and sustaining the Faculty Hearing Committee's recommendation that Plaintiff be dismissed for cause and, as such, they are entitled to absolute immunity from damages under 42 U.S.C. § 1983. *See, e.g., Vakas v. Rodriquez,* 728 F.2d 1293 (10th Cir.1984) (state statute delegated a quasi-judicial role to Kansas Board of Healing Arts, therefore, they are absolutely immune from damages under 42 U.S.C. § 1983 so long as no clear absence of all jurisdiction); *Atiya v. Salt Lake County,* 988 F.2d 1013 (10th Cir.1993) (career services council's duties were functionally comparable to those of state judge and in absence of clear absence of all jurisdiction, council members were entitled to quasi-judicial immunity).

■ Plaintiff asserts that, pursuant to University Regulation 801(3)(e)(3), the decision to terminate Plaintiff was made by the Board of Trustees, as such, the Board of Trustees should only be accorded an execu-

tive type of good faith immunity. The source of Plaintiff's argument emanates from the Supreme Court's holding in *Forrester v. White*, 484 U.S. 219, 229, 108 S.Ct. 538, 545, 98 L.Ed.2d 555 (1988). In *Forrester*, the Supreme Court refused to extend absolute judicial immunity to a judge who hired and then demoted and later fired his probation officer. *Id.* at 221, 108 S.Ct. at 540–41. After discussing the roots and underlying purposes of judicial immunity as well as the distinction between administrative acts (not entitled to absolute immunity) and judicial acts (entitled to judicial immunity), the Supreme Court determined:

> we think it is clear that judge White was acting in an administrative capacity when he demoted and discharged Forrester. Those acts—like many other involved in supervising court employees and overseeing the efficient operation of a court-may have been quite important in providing the necessary conditions of a sound adjudicative system. *The decisions at issue, however, were not themselves judicial or adjudicative.* As Judge Posner pointed out below, a judge who hires or fires a probation officer cannot meaningfully be distinguished from a district attorney who hires and fires assistant district attorneys, or indeed from any other Executive Branch official who is responsible for making such employment decisions. Such decisions, like personnel decisions made by judges, are often crucial to the efficient operation of public institutions (some of which are at least as important as the courts), yet no one suggests that they give rise to absolute immunity from liability in damages under § 1983.

*Id.* at 229, 108 S.Ct. at 545 (emphasis added). Based upon the case law, whether the individual members of the Board of Trustees are entitled to absolute immunity is determined by whether they were acting in an administrative role or serving in an adjudicatory capacity:

> When applied to the paradigmatic judicial acts involved in resolving disputes between parties who have invoked the jurisdiction of the court, the doctrine of absolute judicial immunity has not been particularly controversial. Difficulties have arisen primarily in attempting to draw the line between truly judicial acts, for which immunity is appropriate, and acts that simply happen to have been done by judges. Here as in other contexts, immunity is justified and defined by the *functions* it protects and serves, not by the person to whom it attaches.

*Id.* at 227, 108 S.Ct. at 544. It was also noted in *Cleavinger v. Saxner*, 474 U.S. 193, 202, 106 S.Ct. 496, 501, 88 L.Ed.2d 507 (1985) (citing *Butz v. Economou*, 438 U.S. 478, 512, 98 S.Ct. 2894, 2913–14, 57 L.Ed.2d 895 (1978)):

> Absolute immunity flows not from the rank or title or 'location within the Government,' *Butz v. Economou*, 438 U.S. at 511, [98 S.Ct. at 2913], but from the nature of the responsibilities of the individual official. And in *Butz* the court mentioned the following factors, among others, as characteristic of the judicial process and to be considered in determining absolute as contrasted with qualified immunity: (a) the need to assure that the individual can perform his functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of the precedent; (e) the adversary nature of the process; and (f) the correctability of error on appeal.

Summarizing *Butz*, the Tenth Circuit Court of Appeals has stated:

> The *Butz* decision granted absolute immunity to administrative officials performing functions analogous to those of judges and prosecutors if the following formula is satisfied: (a) the officials' functions must be similar to those involved in the judicial process, (b) the officials' actions must be likely to result in damages lawsuits by disappointed parties, and (c) there must be sufficient safeguards in the regulatory framework to control unconstitutional conduct.

*Horwitz v. Bd. of Med. Examiners of State of Colo.*, 822 F.2d 1508, 1513 (10th Cir.1987). A review of the Board of Trustees' function in

Plaintiff's termination process, as set forth in University Regulation 801(3)(e)(2) and (3), confirms that the first element of the *Horwitz* formula is satisfied.

University Regulation 801(3)(e)(2) and (3) provides:

(2) If the Hearing Committee recommends dismissal, the President will, on request of the faculty member, transmit to the Trustees the record of the case. In such case, the Trustees' review will be based upon the record of the hearing, and it will provide opportunity for argument, oral or written or both, by the principals at the hearing or by their representatives.

(3) The decisions of the Hearing Committee will either be sustained by the Trustees, or the proceeding returned to the Committee with specific objections. If returned, the Committee will then reconsider, taking into account the stated objections and receiving new evidence if necessary. The Trustees will make a final decision only after study of the Committee's reconsideration.

*See* Plaintiff's original Complaint, Exhibit No. 3. While Plaintiff asserts that the Trustees were not sitting as an appellate body, his own amended complaint is telling. (*See* Plaintiff's Amended Complaint ¶ 51.)[11] It should also be noted that, unlike the judge in *Forrester*, the Board of Trustees did not make the determination to hire or fire Plaintiff; its sole purpose was to sit as an appellate body to resolve the dispute generated as a consequence of President Roark's administrative decision that Plaintiff should be dismissed.[12] It is hard to imagine a more true adjudicative function. It is also noteworthy that, while the Board of Trustees sustained the Faculty Hearing Committee's determination that Plaintiff be dismissed for cause, it only did so as a result of Plaintiff's request, pursuant to the University Regulations. It is beyond question that the Board of Trustees' function was similar to those involved in the judicial process.

As to the second element in the *Horwitz* formula, this case is ample proof that the Board of Trustees' determination has and likely would frequently result in damage lawsuits by disappointed parties. Finally, sufficient safeguards exist in the regulatory framework to control unconstitutional conduct. The University Regulations require verbatim records of the Faculty Hearing Committee proceedings to be kept and that a written decision of the Faculty Hearing Committee be made. (*See* University Regulation 801(3)(d), attached as Exhibit No. 3 to Plaintiff's original Complaint.) Moreover, the Board of Trustees' review is specifically limited to the record of these hearings. *Id.* at 801(3)(e)(2). Furthermore, judicial review of the Board and Faculty Hearing Committee's decision is available pursuant to the Wyoming Administrative Procedure Act. Wyo. Stat. § 16–3–101 et seq. and Rule 12, W.R.A.P. Finally, in hearing and rejecting Plaintiff's appeal of the Faculty Hearing Committee's recommendation, the Board of Trustees was not acting in clear absence of all jurisdiction. *See, e.g., Atiya v. Salt Lake County*, 988 F.2d 1013, 1017 (10th Cir.1993). Therefore, this Court finds that the individual members of the Board of Trustees are entitled to quasi-judicial or absolute immunity from damages in a 42 U.S.C. § 1983 action.

Nonetheless, as set forth below, even if this Court were to find that the individual members of the Board of Trustees were not entitled to absolute immunity, Plaintiff has failed to meet his burden of proof with respect to the Board of Trustee's entitlement to qualified immunity.

### e. Qualified Immunity

Plaintiff has also brought claims, under § 1983 against Defendant Roark and the individual members of the Board of Trustees, in their individual capacities. The viability of such an action was recognized by the Su-

---

**11.** Paragraph 52, in its pertinent part states, "The faculty Committee decision was appealed to the Board of Trustees."

**12.** Under University Regulation 801(3)(b) "a formal dismissal proceeding shall be commenced by written communication from the appropriate administrative officer appointed by the President to act as the charging authority to the faculty member and to the chairman of the Hearing Committee...."

preme Court in *Hafer v. Melo*, 502 U.S. 21, 112 S.Ct. 358: "[s]tate officials, sued in their individual capacities, are "persons" within the meaning of § 1983." As noted in *Kentucky v. Graham*, 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985), a personal or individual capacity suit seeks to impose personal liability upon a government official for the actions he or she takes under color of state law. *Id.* at 165–66, 105 S.Ct. at 3104–05. Thus, the Eleventh Amendment does not erect a barrier against a suit to impose individual and personal liability upon President Roark and the individual members of the Board of Trustees sued in their individual or personal capacities. *See Hafer, supra.* However, in a personal liability suit, the individual defendants do enjoy defenses unavailable to a defendant in an official capacity suit.

As stated in *Hafer*:

Personal-capacity suits ... seek to impose individual liability upon a government official for actions taken under color of state law. Thus, "[o]n the merits, to establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." (citing *Kentucky v. Graham*, 473 U.S. 159, 166 [105 S.Ct. 3099, 3105].). While the plaintiff in a personal-capacity suit need not establish a connection to governmental "policy or custom," officials sued in their personal capacities, unlike those sued in their official capacities, may assert personal immunity defenses such as objectively reasonable reliance on existing law.

*Id.* at 166–67, 105 S.Ct. at 3105. This defense has become known as the doctrine of qualified immunity.

Both President Roark and the Board of Trustees have asserted and seek to dismiss Plaintiff's Amended Complaint against them on the basis that they are qualifiedly immune from suit.[13] As governmental officials, Presi-

dent Roark and the Board of Trustees are entitled to assert a defense of qualified immunity:

[g]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

*Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *see also Rozek v. Topolnicki*, 865 F.2d 1154, 1157 (10th Cir.1989).

The purpose served by the qualified immunity doctrine is that of protecting governmental officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority. *See Butz v. Economou*, 438 U.S. 478, 506, 98 S.Ct. 2894, 2910–11, 57 L.Ed.2d 895 (1978); *see also Sawyer v. County of Creek*, 908 F.2d 663, 665–67 (10th Cir.1990). As will be discussed below, it is important to note that this defense is an immunity to suit as well as liability. *See Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815–16, 86 L.Ed.2d 411 (1985).

In response to both President Roark's and the Board of Trustees' assertion of qualified immunity, Plaintiff boldly asserts that this defense is "not available upon the filing of a Motion to Dismiss." (Plaintiff's Memorandum in Opposition to Defendants' Various Motions, at pg. 4.) In support of Plaintiff's position, he cites language contained in *Gomez v. Toledo*, 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980).

In *Gomez*, the district court, pursuant to Rule 12(b)(6), dismissed plaintiff's 42 U.S.C. § 1983 action on the basis of qualified immunity. In granting the defendant's Rule 12(b)(6) motion, the district court concluded that the plaintiff was required to plead, as

---

**13.** Both President Roark and the Board of Trustees for the University of Wyoming have asserted in their initial Motions to Dismiss and their subsequent Motions to Dismiss their defense of qualified immunity. *See Defendants Terry P. Roark and David L. Baker Motion to Dismiss with Prejudice*, ¶ 2, as to the *Amended Complaint*, at ¶ 2; *Motion of the Trustees of the University of Wyo-*

*ming: Bryan Sharratt, W. Perry Dray, Dan Kinnaman, Forrest Kepler, Harry Lee Harris, Peter M. Jorgensen, Geraldine Kirk, Jerry Saunders, M.D., Dave Bonner, Deborah Healy Hammons, David W. "Bud" Updike and F. Richard Brown, to be Dismissed as Defendants*, at ¶ 6, as to *Amended Complaint*, at ¶ 7.

part of his claim for relief, that defendant's alleged actions were committed in bad faith. *Id.* at 637, 100 S.Ct. at 1922. Because the plaintiff had failed to make such an allegation, the district court concluded that it must dismiss the complaint. *Id.* at 637–38, 100 S.Ct. at 1922–23. The Supreme Court reversed the First Circuit Court of Appeals' decision affirming the district court's dismissal. In doing so, the Supreme Court determined:

> [w]e see no basis for imposing on the plaintiff an obligation to anticipate such a defense (qualified immunity) by stating in his complaint that the defendant acted in bad faith.

*Id.* at 640, 100 S.Ct. at 1924. However, Plaintiff's interpretation of the holding in *Gomez* is too broad and ignores the very nature of the qualified immunity defense. *Gomez* simply holds that this Court cannot dismiss a plaintiff's complaint, in a § 1983 action, for failing to assert, in his or her complaint, that defendants acted in bad faith. In addition, *Gomez* requires that the defendant must assert the defense of qualified immunity and that, at the pleading stage, the plaintiff is not required to anticipate that such a defense will be asserted. What *Gomez* forbids this Court from doing is requiring Plaintiff's Complaint or Amended Complaint to anticipate a defense of qualified immunity and plead therein that Defendants' actions were motivated by bad faith. Nonetheless, it is well established, once a defendant raises or asserts the defense of qualified immunity, either in a motion to dismiss or a motion for summary judgment, the burden shifts to the plaintiff to show both facts and law to establish that the defendant is not entitled to qualified immunity. *See Workman v. Jordan, II,* 32 F.3d 475 (10th Cir. 1994); *Workman v. Jordan, I,* 958 F.2d 332 (10th Cir.1992). In *Workman I,* the district court refused to rule on defendant's qualified immunity defense raised in motions to dismiss. On remand, the Tenth Circuit Court of Appeals directed the district court to rule on defendant's qualified immunity defense. *Id.* Plaintiff is simply incorrect in asserting that the defense of qualified immunity is not available or properly raised by Defendants' motions to dismiss. Once a defense of quali-

fied immunity is raised, the burden shifts to the plaintiff and he must show facts and law to establish that defendant is not entitled to qualified immunity. *See Workman II,* at 478–79; *see also Dixon v. Richer,* 922 F.2d 1456, 1460 (10th Cir.1991).

 Plaintiff further asserts that he, "in responding to this preliminary defensive volley, need not reach the factually laden matters inculcated with the concept of qualified immunity." (Plaintiff's Response, at 5.) Plaintiff's statement ignores the well developed analysis that this Court must apply in ruling on an issue of qualified immunity:

> The complaint should include "all of the factual allegations necessary to sustain a conclusion that defendant(s) violated clearly established law." *Dominque v. Telb,* 831 F.2d 673, 677 (6th Cir.1987). Thus, a defendant could, prior to filing an affirmative defense, challenge the complaint under Fed.R.Civ.P. 12(b)(6) on the ground that he or she is entitled to qualified immunity because the pleaded facts failed to show that his or her conduct violated clearly established law of which a reasonable person would have known. Similarly, the defendant could raise the immunity issue in a motion for summary judgment. *In either case, once the defense has been raised, the court must allow the plaintiff the limited opportunity allowed in Fed.R.Civ.P. 12(b)(6) and 56 to come forward with facts or allegations sufficient to show that the law was clearly established when the alleged violation occurred. See Dominque,* 831 F.2d at 677. *Unless such a showing is made, the defendant prevails.* If the plaintiff has identified the clearly established law and the conduct that violated the law, the defendant as the movant in a motion for summary judgment bears the normal burden of showing that no material issues of fact remain that would defeat his or her claim of qualified immunity.

> *The question for the trial court to resolve is a legal one; the court cannot avoid the question by framing it as a factual issue. Id.* The court's decision should identify the law upon which it relied and state the basis for its conclusion. *Id.* Because the doctrine of qualified immunity

represents a balance that has been struck between competing values, *Harlow,* 457 U.S. at 813–15, 102 S.Ct. at 2735–37,

> the trial judge is burdened with a responsibility at an early stage, to make determinations of law based upon what the clearly established law governing the case was at the time of the challenged acts. *Once the issue of qualified immunity is properly injected in the case, either by a motion to dismiss, an affirmative defense, or a motion for summary judgment, the plaintiff is obliged to present facts which if true would constitute a violation of clearly established law. Dominque,* 831 F.2d at 677.

*Pueblo Neighborhood Health Centers, Inc. v. Losavio,* 847 F.2d 642, 646 (10th Cir.1988) (emphasis added). As to carrying the burden of convincing the court that the law was clearly established, "a plaintiff must do more than identify, in the abstract, a clearly established right and allege that the defendant has violated it." *Id.* at 645 (citing *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987)). Hence, contrary to Plaintiff's assertions, the text and structure of both the definition and application of qualified immunity can be put into issue this early in trial progression. Neither this Court nor Plaintiff can avoid addressing the issue of qualified immunity. To do so would defeat the purpose of the qualified immunity: "[t]he entitlement is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell, supra,* 472 U.S. at 526, 105 S.Ct. at 2815.

Before addressing the merits of qualified immunity it should be noted that Plaintiff has been given ample opportunity to submit additional materials on all the issues before the court.[14] In addition, the record reveals that both parties have engaged in discovery. Yet, Plaintiff's only response to Defendants' assertion of qualified immunity has been to assert, incorrectly, that the defense is not properly raised at this stage in the proceeding. Thus, this Court has only Plaintiff's complaint from which it must determine whether Plaintiff has plead sufficient facts or allegations to show both that the defendants alleged conduct violated the law and that the law was clearly established. *See Dixon, supra,* at 1460.

▊ The review this Court must employ, when a claim of qualified immunity is asserted at this stage in the proceedings, has been previously set forth. *See Sawyer v. County of Creek,* 908 F.2d 663, 665 (10th Cir.1990).

Following a defendant's motion to dismiss, the district judge should permit plaintiff to come forward with any additional allegations showing that defendant violated clearly established law. *Pueblo Neighborhood,* 847 F.2d at 646. The Court must then determine whether the complaint includes "all of the factual allegations necessary to sustain a conclusion that defendant violated clearly established law." *Powell v. Mikulecky,* 891 F.2d 1454, 1457 (10th Cir.1989).

In addition to coming forward with necessary factual allegations, the plaintiff must demonstrate that the right in question was clearly established at the time of defendant's conduct. *Pueblo Neighborhood,* 847 F.2d at 646. *The Plaintiff cannot meet this burden merely by identifying a clearly established right and then alleging that the defendant violated it. The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). *Unless the plain-*

---

14. After oral hearing on Defendants Motions to Dismiss, on July 8, 1994, the Court gave counsel until July 21, 1994 to submit supplemental materials concerning the issues raised in Defendants' motions. In addition, on July 28, 1994, by a notice of conversion of Terry P. Roark's Rule 12(b)(6) Motion to Dismiss to a Rule 56 Motion for Summary Judgment, all parties were given until August 8, 1994 to file any additional materials made pertinent to such a motion. None were filed. While this Court has determined not to convert Defendant Roark's motion, all parties were given the opportunity to submit additional materials. Finally, after Defendants' initial Motions to Dismiss were filed, asserting the defense of qualified immunity, Plaintiff filed an Amended Complaint.

*tiff both demonstrates a clearly established right and comes forward with the necessary factual allegations, the "government official is properly spared the burden and expense of proceeding any further,"* Powell, 891 F.2d at 1457. (emphasis added)

*Sawyer,* 908 F.2d at 666; *see also Hannula v. City of Lakewood,* 907 F.2d 129, 131 (10th Cir.1990) (to overcome defense of qualified immunity plaintiff must do more than identify a clearly established legal test and then allege that the defendant has violated it). With these standards in mind, we must now turn to Plaintiff's complaint to determine if it alone is sufficient to meet his burden of showing both facts and law to establish that defendants are not entitled to qualified immunity. *Workman II,* 32 F.3d 475 (10th Cir.1994).[15]

### 1. *Violation of Plaintiff's Right to Due Process*

■ In his amended complaint, Plaintiff asserts that "Terry P. Roark and the Trustees of the University of Wyoming, separately and together, violated Plaintiff's property interest in his continued employment without due process of law, under color of state law, proximately causing Plaintiff damage." (Plaintiff's Amended Complaint ¶ 58.) Plaintiff further asserts that Defendants' acts, as set forth in the amended complaint, violated clearly established law which a reasonable person should have known. *Id.* ¶ 61. As previously discussed, Plaintiff, as a tenured University Professor, did enjoy a property interest pursuant to University Regulations. This fact does not appear to be contested. Thus, this Court must determine, reviewing Plaintiff's Amended Complaint in the light most favorable to him and drawing all inferences in his favor, whether the Plaintiff received due process in his termination.

**15.** Applying *Workman II* and other case law, because Defendants have raised the defense of qualified immunity, the burden has shifted to Plaintiff to show both facts and law to establish that Defendants are not entitled to qualified immunity and do more than identify, in the abstract, a clearly established right. *See Pueblo Neighborhood Health Centers, supra,* at 645.

■ The requirements of due process with regard to a termination of employment are well established:

> Due process requires that plaintiff have had an opportunity to be heard at a meaningful time and in a meaningful manner before termination. (citation omitted). This requirement includes three elements: 1) an impartial tribunal; 2) notice of charges given a reasonable time before the hearing; and 3) a pretermination hearing except in emergency situations. *Patrick v. Miller,* 953 F.2d 1240, 1244. The pretermination hearing, though necessary, need not be elaborate or formal. The procedural requisites and formality of pretermination procedures vary depending on the importance of the interests involved and the nature of the post-termination proceedings. (citation omitted). Under *Loudermill,* the adequacy of pre-termination procedures must be examined in light of available post-termination procedures. *See Derstein v. Kansas,* 915 F.2d 1410, 1413–14 (10th Cir.1990), *cert. denied,* 499 U.S. 937, 111 S.Ct. 1391, 113 L.Ed.2d 447 (1991).

*Langley v. Adams County, Colo.,* 987 F.2d 1473, 1480 (10th Cir.1993). Under *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), a tenured public employee can be discharged if he is given oral or written notice of the charges against him, an explanation of the employer's evidence, and the tenured employee is given an opportunity to present his side of the story. *See Derstein v. State of Kansas,* 915 F.2d 1410, 1413 (10th Cir.1990); *Melton v. City of Oklahoma City,* 879 F.2d 706, 718–19 (10th Cir.1989). Applying the standards and elements to Plaintiff's Complaint, it cannot be said Plaintiff was deprived of his property right without due process of law or that Defendants violated any clearly established law.

> Thus, this Court could arguably, without further analysis, determine that Defendants are entitled to qualified immunity because Plaintiff has failed to meet or respond to his burden. Nonetheless, this Court, mindful of the important constitutional issues raised by Plaintiff, declines to take this shortcut.

### (i.) *impartial tribunal*

After President Roark's formal charges were filed against Plaintiff, and prior to his termination, a Faculty Hearing Committee was convened to hear the charges. (*See* Plaintiff's Complaint, ¶ 43.) After hearing two weeks of testimony, the faculty hearing committee sustained three of the charges and recommended that Plaintiff, Dr. Gressley, be dismissed for cause. (*See* Plaintiff's Amended Complaint ¶ 44; *see also* Exhibit No. 8, as attached to original Complaint.) Plaintiff's Complaint does not assert, either directly or indirectly, that the Faculty Hearing Committee was biased nor does it provide any facts which would support such an inference.

In light of the decision by the Faculty Hearing Committee, Plaintiff then appealed this decision to the University's Board of Trustees. (*See* Plaintiff's Amended Complaint ¶ 51.) The Board of Trustees, while rejecting some of the findings by the Faculty Hearing Committee, nonetheless, unanimously sustained the Committee's recommendation that Dr. Gressley be dismissed for cause.[16] In his amended complaint, Plaintiff asserts and concludes that "[t]he Board of Trustees by recognition of the consequences of the finding of untimeliness and inappropriately desiring to sustain the President lest they be forced to find a new one, made their own findings." *Id.* ¶ 52. Other than this naked assertion, Plaintiff has neither stated any facts nor produced or attached any materials to his complaint from which it can be concluded, or even inferred, that the Board of Trustees' was biased. Thus, neither Plaintiff's Amended Complaint nor his attachments to the original complaint assert facts from which this court could find that the Board of Trustees was not impartial and was biased with respect to the issues before it. *See Staton v. Mayes,* 552 F.2d 908, 914 (10th Cir.1977).

### (ii.) *notice of charges*

As previously discussed and revealed in his complaint and amended complaint, in April of 1992 Plaintiff was provided with a draft of the formal charges which President Roark

intended to file against him. (*See* Plaintiff's Amended Complaint ¶ 40; Exhibit No.'s 1 and 2 to original Complaint.) These charges were not filed with the Faculty Hearing Committee until November of 1992. (*See* Amended Complaint ¶ 42.) The Faculty Hearing Committee did not begin its hearing on the formal charges against Plaintiff until January 18, 1993. (*See* Plaintiff's Complaint, Exhibit No. 8 at 4.) Thus, it cannot be said Plaintiff did not have adequate or reasonable notice to prepare his side of the story. *See Derstein,* 915 F.2d at 1413 (ten day notice of the charges, the nature of the allegations and an opportunity to respond found sufficient). Furthermore, as revealed by the copy of the charges attached to the Plaintiff's complaint, they provided specific details of the facts and grounds upon which President Roark sought to terminate Dr. Gressley. Finally, Plaintiff's Amended Complaint makes no assertions that he was provided inadequate notice of the specific charges against him or that he was denied an opportunity to respond. Thus, Defendants did not violate any clearly established law with respect to the second element.

### (iii.) *a pretermination hearing*

Plaintiff was terminated from his position with the University of Wyoming after the Board of Trustees accepted the recommendation of the Faculty Hearing Committee. (*See* Plaintiff's Amended Complaint ¶ 52; *see also,* Plaintiff's Complaint, Exhibit No. 8 at 9.)

 In his Amended Complaint Plaintiff states that "[a]lthough the letter to Mrs. Deutsch had been written at her request, her 'testimony' to the contrary provided by a false edited ex-parte tape recording which was admitted in evidence at the hearing (before the Faculty Hearing Committee) over the objection of Gressley's counsel in direct contravention of the University's due process procedural regulations for this kind of hearing. In fact, Mrs. Deutsch was "hung over" at the time she gave her testimony." *Id.* ¶ 50. However, in sustaining the Faculty Hearing Committee's recommendation that

---

**16.** While the Board of Trustees' decision is not signed or executed by them, because this document has been attached to Plaintiff's Complaint and referenced by him, this Court will presume that this was the formal decision rendered by the Board of Trustees.

Plaintiff be dismissed for cause, the Board of Trustees found:

> The Board *REJECTS* finding 13(h) to the extent that it is premised upon the testimony of Mrs. Deutsch. While the Committee acted in good faith to elicit testimony which would reflect most favorably upon Dr. Gressley's position in this case, the lack of opportunity for Dr. Gressley's counsel to cross-examine Mrs. Deutsch was sufficient to dictate that her testimony should have been disregarded. The Board has disregarded Mrs. Deutsch's testimony. The Board instead *FINDS:*
>
>> That, even without Mrs. Deutsch's testimony, clear and convincing evidence exists in the record to sustain the other findings contained in Paragraph 13 and its subparts.

(Exhibit No. 8, as attached to Plaintiff's Complaint.) It does not appear that the Faculty Hearing Committee's acceptance of the testimony of Helen Deutsch violated Plaintiff's due process rights, as a tenured employee. The requirements of due process are defined by constitutional law. *Cleveland Board of Education v. Loudermill,* 470 U.S. at 541–42, 105 S.Ct. at 1492–93. Furthermore, as set forth in *Loudermill:*

> [T]he tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story. *See Arnett v. Kennedy,* 416 U.S. 134, 170–71 [94 S.Ct. 1633, 1652, 40 L.Ed.2d 15] (1974) (opinion of Powell, J.); *id.,* at 195–96 [94 S.Ct. at 1664–65] (opinion of White, J.); *see also Goss v. Lopez,* 419 U.S. 565, 581 [95 S.Ct. 729, 739–40, 42 L.Ed.2d 725] (1975). To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee.

*Loudermill,* 470 U.S. at 546, 105 S.Ct. at 1495. As revealed in the detailed formal charges filed against him by President Roark, Plaintiff knew that the incident with Helen Deutsch was one of the several bases upon which President Roark sought Plaintiff's removal. (*See* Exhibit No.'s 1 and 4.) In addition, it was only one of several reasons why the Committee sustained the charges filed by President Roark. (*See* Plaintiff's Amended Complaint ¶ 44.) Finally, any concerns about the use of the Faculty Hearing Committee's consideration of Helen Deutsch's testimony was eliminated by the Board of Trustees' refusal to consider it in reviewing the decision of the Committee, prior to Plaintiff's termination. (*See* Exhibit No. 8 at 8, as attached to Plaintiff's original Complaint.) Plaintiff has failed to present any facts or law establishing that either President Roark or the Board of Trustees violated Plaintiff's due process rights.

Plaintiff appealed the decision of the Faculty Hearing Committee to the Board of Trustees, which, after reviewing the transcript of the Faculty Hearing Committee, briefs by both sides and hearing oral argument, accepted the Committee recommendation that Plaintiff be dismissed and empowered President Roark to do so. (*See* Plaintiff's Amended Complaint ¶¶ 51 and 52; *see also,* Exhibit No. 8, as attached to Plaintiff's original Complaint.) Therefore, it cannot be said that Plaintiff was not afforded a pretermination hearing. He received an initial trial-type proceeding before the Faculty Hearing Committee which was then reviewed by the Board of Trustees.

(iv.) *violation of university regulations*

Throughout his amended complaint and response to Defendants' motions, Plaintiff has made the assertion that pursuant to University Regulation 801(3)(b) President Roark was not the proper administrative officer to bring formal charges against him. (*See* Plaintiff's Amended Complaint ¶ 41; *see also* Exhibit No. 3 attached to Plaintiff's original Complaint.) University Regulation 801(3)(b) provides:

> A formal dismissal proceeding shall be commenced by a written communication from the appropriate administrative officer appointed by the President to act as a charging authority to the faculty member and to the Chairman of the Hearing Committee. . . .

Plaintiff asserts that because his tenure was in the library, the charges should have been filed by the head of the library. However,

even assuming that President Roark was not the proper "administrative officer" this Court does not see how, and Plaintiff has not offered any authority to show, President Roark's filing of the formal charges deprived him of his constitutional rights. *See Elder v. Holloway,* —— U.S. ——, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994) (recognizing that a state official's clear violation of a state administrative regulation does not allow a § 1983 claim to overcome the official's qualified immunity); *see also Davis v. Scherer,* 468 U.S. 183, 194–196, 104 S.Ct. 3012, 3019–20, 82 L.Ed.2d 139 (1983) (officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision.). Thus, even assuming that President Roark was not the proper person to bring charges, this alone does not create a violation of Plaintiff's constitutional rights.[17] Regardless of who brought the charges, it is unrefutable that Plaintiff was afforded due process prior to his termination. Plaintiff has not alleged that this action violated any federal statute or constitutional law.

■■■ Plaintiff also asserts that the formal charges were not timely brought pursuant to University Regulation 801(3)(a)(3). (*See* Plaintiff's Amended Complaint ¶ 41.) This regulation provides:

> If at any time during the preliminary proceedings the faculty member requests that the formal proceedings be held, these shall be initiated within one month or the matter shall be dropped.

Plaintiff claims that in August his counsel requested that formal charges be filed. (*See* Exhibit No. 2, as attached to Plaintiff's original Complaint.) It is unrefuted that formal charges were not filed until November 10, 1992. (*See* Exhibit No. 8, at 5, as attached to Plaintiff's original Complaint.) As set forth in the Board of Trustees' decision, it determined that the formal charges were timely brought. *Id.* at 4–6. Nonetheless, even assuming that the charges were not timely brought, "an official's clear violation of a state administrative regulation does not allow a § 1983 plaintiff to overcome the official's qualified immunity." *Elder, supra,* —— U.S. at ——, 114 S.Ct. at 1023 (citing with approval, *Davis v. Scherer, supra*). Once again, Plaintiff has not shown how Defendants' violation of this regulation "either is itself actionable under § 1983 or bears upon the claim of constitutional right that appellee (plaintiff) asserts under § 1983." *Davis, supra,* 468 at 193, 104 S.Ct. at 3018. In *Davis,* the Supreme Court has specifically rejected the argument

> "that a defendant official's violation of a clear statute or regulation, although not itself the basis of suit, should deprive the official of qualified immunity from damages for violation of other statutory or constitutional provisions." *Id.*

A fair reading of *Davis* requires that the violation of the statute or regulation must itself provide a claim that Plaintiff was denied due process or some other constitutionally protected right. This Court is unaware of any case law, and Plaintiff has cited none, which would require that these charges be brought within a specified time in order for due process or other constitutional requirements to be satisfied. Therefore, the Court finds that even if the thirty (30) day requirement under University Regulation 801(3)(a)(3) was violated, this violation does not cause the Defendants to lose their qualified immunity.

### 2. *Plaintiff's Liberty Interest*

■■■ Plaintiff clearly has a liberty interest in his good name and reputation as it affects his protected property interest in continued employment. *See Workman (II),* 32 F.3d at 481–82. Under his amended complaint Plaintiff asserts that he was falsely deprived of his liberty interest in his good name and reputation, proximately causing him damage. The basis of this assertion appears to be the allegedly false statements made by Helen Deutsch regarding a statement she made concerning who directed who

---

**17.** Footnote No. 12 in *Davis, supra,* notes, "Neither federal nor state officials lose their immunity by violating the clear command of a statute or regulation—of federal or state law—unless that statute or regulation provides the basis for the cause of action sued upon." *Id.* at 194, 104 S.Ct. at 3019.

to draft backdated letters relating to the Duffy painting. *Id.* ¶ 37; *see also* Exhibit No. 4, as attached Plaintiff's Complaint.

██ The necessary elements to establish a cause of action for deprivation of a liberty interest have recently been outlined by the Tenth Circuit:

> First, to be actionable, the statements must impugn the good name, reputation, honor or integrity of the employee. (citations omitted). Second, the statements must be false. (citations omitted). Third, the statements must occur in the course of terminating the employee or must foreclose other employment opportunities. (citations omitted). And Fourth, the statements must be published. (citations omitted). These elements are not disjunctive, all must be satisfied to demonstrate deprivation of the liberty interest. *Melton v. City of Oklahoma City*, 928 F.2d 920 (en banc), *cert. denied* 502 U.S. 906, 112 S.Ct. 296, 116 L.Ed.2d 241 (1991).

*Workman (II)*, at 481. Plaintiff's Amended Complaint does not provide or indicate what the precise statements were. Nonetheless, for purposes of these motions to dismiss, the Court will assume that they did or would impugn the good name, reputation, honor or integrity of the Plaintiff. Yet, Plaintiff has not established a colorable showing of falsity. *Workman II, supra.* Even assuming, for the purpose of this Court's analysis, that they were and did occur during the course of Plaintiff's termination proceeding, the fourth prong of the *Workman II* test has not been satisfied. Plaintiff's Amended Complaint fails to indicate that these statements were published or made public. In discussing this requirement in the context of a police officer's termination the Supreme Court noted:

> In this case the asserted reasons for the City Manager's decision were communicated orally to the petitioner in private and also stated in writing in answer to interrogatories after this litigation commenced. Since the former communication was not made public, it cannot properly form the basis for a claim that petitioner's interest in his 'good name, reputation, honor, or integrity' was thereby impaired. And since the latter communication was made

in the course of a judicial proceeding which did not commence until after petitioner had suffered the injury for which he seeks redress, it surely cannot provide retroactive support for his claim.

*Bishop v. Wood*, 426 U.S. 341, 348, 96 S.Ct. 2074, 2079, 48 L.Ed.2d 684 (1976). Nothing in Plaintiff's complaint supports a conclusion that Helen Deutsch's statement, whatever it may have been, was ever published. The assertions that Plaintiff had drafted the back dated letter and requested Mrs. Deutsch to sign it were contained in the draft and formal notice of charges sent by President Roark to Plaintiff, prior to his pre-termination hearing. Yet, nothing has been submitted to this Court which would show or establish that the allegedly false statements were published. Thus, Plaintiff has not satisfied the elements for a deprivation of a liberty interest. *See Workman (II), supra.*

Furthermore, through President Roark's charges, Plaintiff was made aware of these allegedly false statements by Helen Deutsch well in advance of his hearing before the Faculty Hearing Committee. Thus, he had an opportunity to clear his name and refute the allegedly false statements. *See Board of Regents v. Roth*, 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972). In *Roth*, the Supreme Court stated:

> [F]or 'where a person's good name, reputation, honor, or integrity is at stake because of an opportunity to be heard are essential.' (citations omitted). In such a case, due process would accord an opportunity to refute the charge before University officials.

Plaintiff was afforded such an opportunity. Plaintiff has not met his burden of showing both facts and law to establish that Defendants are not entitled to qualified immunity.

### 3. Asserted Violation of Plaintiff's First Amendment Rights

Plaintiff has asserted that Defendants Roark and the Trustees retaliated against him for the content of his speech in speaking on legitimate matters of public concern including complaining regarding the shabby treatment donors were receiving. (*See* Plaintiff's Amended Complaint ¶ 63.) Plain-

tiff further asserts that the Defendants retaliated against him on account of his association with "important people around the state." Plaintiff's Amended Complaint also alleges that:

Plaintiff's constitutionally protected right to speak freely with donors and others about the American Heritage Center and about his changed employment status was abridged by Defendant Roark. Plaintiff had requested to inform others of changes made to his status and restrictions placed on him. See Attachment 6 to Complaint. His request to speak was denied by Defendant Roark's attached letter. See Attachment 7 to Complaint. Additionally, Roark instructed his secretary to call Plaintiff and inform him of his lack of permission to send the letter.

*Id.* ¶ 50(a).

(i.) *freedom of speech*

■ The analysis employed in a first amendment, violation of free speech claim has been set forth in *Powell v. Gallentine*, 992 F.2d 1088, 1090 (10th Cir.1993):

The court's inquiry in a First Amendment case covers four steps. *Melton v. City of Oklahoma City*, 879 F.2d 706, 713 (10th Cir.1989), modified on other grounds, 928 F.2d 920 (10th Cir.) (en banc), cert. denied, [502] U.S. [906], 112 S.Ct. 296, 116 L.Ed.2d 241 (1991). First, the court must determine whether the "employee's speech touches upon a matter of public concern." *Id.* (citing *Connick [v. Myers]* 461 U.S. 138, 103 S.Ct. 1684 [75 L.Ed.2d 708 (1983)]). If the speech involved a matter of public concern, the court must then balance "the interests of the employee in making the statement against the public employer's interest in the effective and efficient fulfillment of its responsibilities to the public." *Id.* (citing *Pickering v. Board of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968)). These first two steps involve questions of law for the court. *Id.* Third, assuming the *Pickering* balancing test tipped in favor of the plaintiff, he or she must show that the protected speech was a "motivating factor" in the employer's detrimental employment decision. *Id.* (quoting *Mt. Healthy City School Dist. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977)). Finally, "if plaintiff makes this showing, the burden shifts to the employer to show by a preponderance of evidence that it would have reached the same decision in the absence of the protected activity." *Id.* The third and fourth steps involve questions of fact for the jury. *Id.*

Again, this Court is faced with making a determination on Defendant's claims of qualified immunity with only the Plaintiff's amended complaint to guide it. Plaintiff's Amended Complaint sets forth neither facts nor law which would support a conclusion that the Board of Trustees, in sustaining the Faculty Hearing Committee's recommendation that Plaintiff be dismissed, somehow retaliated against him for speaking out on legitimate matters of public concern. Thus, at the outset, the Board of Trustees is entitled to qualified immunity on the freedom of speech claim. The real question is whether President Roark violated the law and whether that law was clearly established at the time of his conduct.

■ As to matters of public concern, it was recently summarized by Judge Brimmer that:

if the employee's speech does not involve a matter of public concern, then it is unnecessary for us to scrutinize the reasons for [the employer's adverse employment decision]. When employee expression cannot be fairly considered as [involving a matter of public concern,] government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment. (brackets supplied).

*Gardetto v. Mason*, 854 F.Supp. at 1536; (citing with approval *Flanagan v. Munger*, 890 F.2d 1557, 1562 n. 4 (10th Cir.1989)). Determinations as to whether the speech touches upon matters of public concern "must be determined by the content, form, and context of the given statement[.]" *Rankin v. McPherson*, 483 U.S. 378, 384–85, 107 S.Ct. 2891, 2896–97, 97 L.Ed.2d 315 (1987). The speech must also "relate to a topic of political, social or other concern to the com-

munity." *McEvoy v. Shoemaker*, 882 F.2d 463, 465–66 (10th Cir.1989). In *McEvoy*, the plaintiff had brought a § 1983 action against his employers for allegedly improperly denying him a promotion to the rank of captain as a result of a letter he wrote to the city council complaining of the mismanagement of his superiors. *Id.* at 465. After citing the general principles the court went on to refine what speech touches upon matters of public concern and noted:

> But speech which may be of general interest to the public is not automatically afforded first amendment protection. (citations omitted). [W]e recently recognized that in analyzing such issues, 'courts have particularly focused on the extent to which the content of the employee speech was calculated to disclose wrongdoing or inefficiency or other malfeasance on the part of government officials in the conduct of their official duties. More recently, in *Conaway v. Smith*, 853 F.2d 789, 796 (10th Cir.1988), we emphasized that in analyzing whether speech constitutes a matter of public concern, the focus is on the motive of the speaker, '*i.e.*, whether the speech *was calculated* to disclose misconduct or dealt with only personal disputes and grievances with no relevance to the public interest.' (emphasis in original). *See also Callaway*

*v. Hafeman*, 832 F.2d 414, 417 (7th Cir. 1987) (courts may look at the point of the speech: Was the employee's point to bring wrongdoing to light or raise other issues of public concern because they are of public concern, or was the point to further some purely private interest?).

*Id.* at 466. After reviewing plaintiff's letter, the court in *McEvoy*, concluded that plaintiff's

> "principal purpose in writing it (the letter) was not to disclose 'malfeasance on the part of government officials in the conduct of their official duties,' *Koch v. City of Hutchinson*, 847 F.2d 1436, 1445 (10th Cir. 1984) (en banc), *cert. denied*, [488] U.S. [909], 109 S.Ct. 262, 102 L.Ed.2d 250 (1988), but instead to air his frustration at having failed to receive a promotion."

The court concluded "that McEvoy's (plaintiff's) letter served only to express his disappointment over internal office affairs." *Id.* at 467. The "form letter" which Plaintiff proposed to send to three hundred (300) of his friends, as well as friends and donors of the University and American Heritage Center, mirrors, in its intent, the letter in *McEvoy*. (*See* Exhibits No.'s 6 and 7 as attached to Plaintiff's original Complaint.)[18] In re-

**18.** The "form letter," in its entirety, reads:

Dear

As a long-term friend of mine and the University, as well as a donor and patron of the University, I feel it prudent to write you about some recent changes in my responsibilities at the University. President Terry Roark has directed that I devote my duties to academic research and teaching. In order to effectuate what he perceives to be in the best interests of the University, I have been instructed as follows:

> You have previously discussed what you believe to be a responsibility to communicate with various individuals with whom you have dealt in your previous capacities. It is important that donors and patrons of the American Heritage Center clearly understand that they need to deal directly with the Director and staff. Therefore, you should not carry out University communication with donors or patrons of the Center about their relationship with the Center or the University. Any such communications received from these individuals are to be forwarded to the American Heritage Center. You are instructed to respond with a simple statement that you are no longer associated with the AHC and provide them with the name and address of the Director of the AHC. You

> are not to intervene, to act as any kind of intermediary, or otherwise be involved in matters between donors/patrons and the Center.

Because of the uncertainty of the host of subjects that might develop during our future written or oral exchanges as friends, I wanted you to be aware of this restriction, by the President, on my expression. As you know, as an employee of the University, I must, of course, adhere to the President's directive.

On the teaching front, at President's Roark's direction, I will be teaching an undergraduate survey course in the fall. This should prove interesting for both my students and myself as I have never taught at this level in my 39 years of professional activity. As it relates to academic research, I have been involved in securing funding for work in several areas. I have now been directed by President Roark, as it relates to these projects:

> As to your inquires about contacting donors of the $36,000 you are instructed *not* to contact them and *not* to make or accept any contributions without first coordinating with appropriate University offices. I emphasize that you do not have independent authority to accept such contributions. You are specifically directed

sponse to Plaintiff's letter, President Roark did not find the draft letter appropriate or consistent with his previous instructions. President Roark further stated:

"There is no necessity for you to write to 300 people under the pretext you are communicating about your level of authority while essentially presenting your individual and personal complaints about the change of assignment.... To the extent you are seeking my approval of your letter you certainly do not have it. I do not think the letter is in the best interest of the University, nor even your own best interest."

(*See* Exhibit No. 7, as attached to Plaintiff's original Complaint.)

A review of Plaintiff's "form letter" or "speech" clearly demonstrates that Plaintiff's purpose in writing it was to express his personal disagreement with his change in position. As such it does not touch upon a matter of public concern. *See e.g., McEvoy v. Shoemaker, supra,* at 466. Thus, this Court does not need to apply the *Pickering* balancing test. *See Powell v. Gallentine,* 992 F.2d at 1090.

Yet, even if the *Pickering* test was applied to the facts of this case, Plaintiff's own form letter includes quotations from President Roark's letter to him which amply demonstrate that President Roark's intent was to meet his responsibilities as President of the University by instructing Plaintiff "not [to] carry out University communications with donors or patrons of the Center about their relationship with the Center or the University." Once again, Plaintiff has failed to present facts and law to establish that the Defendants are not entitled to qualified immunity.

*(ii.) freedom of association*

■ Plaintiff has asserted that both President Roark and the Board of Trustees retaliated against him on account of his association with important people around the state and prohibited him from contacting and informing them that his ability to speak to them on certain matters had been curtailed. (*See* Plaintiff's Amended Complaint ¶ 63.) It has been recognized that there are two types of association protected by the First Amendment.

"In one line of decisions, the Court has concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme. ("intimate association") In this respect, freedom of association receives protection as a fundamental element of personal liberty. In another set of decisions, the Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for redress of grievances, and the exercise of religion." ("political association").

*Schalk v. Gallemore,* 906 F.2d 491, 497–98 (10th Cir.1990) (citing *Roberts v. United States Jaycees,* 468 U.S. 609, 617–18, 104 S.Ct. 3244, 3249–50, 82 L.Ed.2d 462 (1984)). In *Schalk,* the plaintiff alleged that her First Amendment rights of freedom of association were infringed when she was allegedly restricted in her access to the board of trustees of the hospital and fired for writing a letter to, and later speaking with, hospital board members about management practices at the

---

that all request for extramural funding of any kind are to be handled in accordance with the University procedures established to solicit agency, corporate and foundation contributions through the Offices of Research and Development. (emphasis supplied).
You may find it interesting, as I do, that my value to the University is no longer perceived as making friends for the University and acquiring funds and material for the University, but rather in teaching a freshman survey and doing research for which I am restricted in my financial underwriting.

I deeply regret this situation, but as long and consistent friend, as well as a friend of the University, I feel bound to appraise you of this development.
I want to emphasize that I look forward to continuing our personal friendship, and I do hope that it will be to the benefit of all, as it has been in the past. With warmest good wishes;
Cordially,
Gene M. Gressley
*See* Exhibit No. 6, as attached to Plaintiff's Complaint.

hospital. *Id.* at 492. Specifically, the court found that the letter "[w]hile express[ing] concern over a wide range of internal employee situations, the overall tone and underlying message [was] directed at waste, inefficiency, and favoritism at the hospital." *Id.* at 495. Addressing plaintiff's freedom of association claims, the court found that plaintiff's circumstances fit into neither category of "associations" as recognized in *Roberts.* Plaintiff's complaint did not allege that her right of "intimate association" was impaired by the restrictions on her speaking to board members. Furthermore, the court found that her "political association" was indistinguishable from her right to free speech. Finally, the court concluded that the "association" plaintiff sought was nothing more nor less than an audience for her speech and, therefore, collapsed into and was subject to the same analysis as applied in a freedom of speech claim. *Id.* at 498. If the same conclusion was reached concerning Dr. Gressley's claim of freedom of association, it would also fail because it does not touch upon matters of "public concern." However, it is not absolutely clear whether the "public concern" requirement is applicable in a freedom of association claim.[19] As in *Schalk,* this Court does not see a reason to treat Plaintiff's speech and association differently where the association he seeks is an audience to air his complaints concerning changes in his employment status. Furthermore, as set forth in President Roark's letter, it was Plaintiff's University communication with donors and patrons of the University about their relationship with the University and the American Heritage Center that President Roark sought to limit, (*See* Exhibits No.'s 6 and 7), not Plaintiff's communications or associations with friends. A thorough review of Plaintiff's Amended Complaint and exhibits attached to his original complaint reveals no facts to even suggest that he was terminated for his associations with "important people."

Nonetheless, even if this Court were to bypass the "public concern" requirement and apply the *Pickering* balancing test, Plaintiff's claim would still fail.[20] Factors to be considered in applying the test were recently summarized in *Patrick v. Miller:*

> A number of factors are considered in evaluating Defendants' interest under the *Pickering* balancing test. Pertinent considerations include 'the manner, time, and place of the employee's expression ... the context in which the dispute arose ... [and] whether the statement impairs discipline by superiors or harmony among coworkers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speakers duties *or interferes with the regular operations of the enterprise.*' (emphasis added) *Rankin,* 483 U.S. at 388, 107 S.Ct. at 2899.

*Patrick v. Miller,* 953 F.2d 1240, 1248 (10th Cir.1992). Here the University's responsibility to the public to protect its relationship with donors and patrons (the effective functioning of the public employer's enterprise) far outweighed Plaintiff's interest in communicating with University donors and patrons, who may have also been his friends, concerning his job reassignment. Furthermore, President Roark did not prohibit Plaintiff from communicating with his friends. President Roark only instructed Plaintiff to refrain from "carry[ing] out University communications with donors or patrons of the Center *about their relationship with the Center and University.*" (*See* Exhibit No. 6, as attached to Plaintiff's original Complaint.) Plaintiff was not retaliated against due to his

---

**19.** In *Schalk,* footnote number 6, the court states: We do not hold that the "public concern" analysis is a necessary step in all public employee/freedom of association claims. *See Flanagan v. Munger,* 890 F.2d 1557, 1564 n. 7 (10th Cir.1989) (expressing doubt regarding application of "public concern" analysis to freedom of association claims). In some constitutionally protected associations, "public concern" may be an inapt tool of analysis. For example, a public school teacher fired for being married would have a colorable freedom of association claim against her employer, but would likely not satisfy the public concern test. We see no reason to treat speech and association differently in cases like the one at bar, however, where, in context, the two interests are clearly identical.

**20.** By implication, *Schalk, supra* would suggest that this is the proper analysis to apply where in contexts the two issues are not clearly identical. This same conclusion and analysis was applied by Judge Brimmer in *Gardetto, supra.*

personal relationships or associations. President Roark sought only to protect the University's and American Heritage Center's substantial interest in its relationships with donors and patrons.

Plaintiff's Amended Complaint fails to state a claim that either President Roark or the Board of Trustees violated any clearly established law with respect to his constitutional right of freedom of association.

### CONCLUSION

To summarize: this Court lacks jurisdiction over plaintiff's 42 U.S.C. § 1983 claims against President Roark and the University of Wyoming Board of Trustees, in their official capacities; Plaintiff has failed to plead sufficient facts to support a conspiracy claim against Defendant, Helen Deutsch; the Board of Trustees are absolutely immune from any suit for damages pursuant to 42 U.S.C. § 1983; and Plaintiff's Amended Complaint, alone, is insufficient to meet his burden of showing both facts and law to establish that defendants are not entitled to qualified immunity with respect to his 42 U.S.C. § 1983 claims. Finally, in light of this Court's determination that all of Plaintiff's 42 U.S.C. § 1983 claims are precluded, Plaintiff's pendant state claims, breach of contract and defamation, need not be addressed since this Court lacks jurisdiction to entertain them. *See,* 28 U.S.C. § 1441.

THEREFORE, it is hereby

**ORDERED** that Defendants' Motions to Dismiss Plaintiff's Claims with Prejudice are hereby granted.